[Cite as *State v. McKenzie*, 2018-Ohio-1321.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27640 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-137 |
| | : | |
| THORNTON MCKENZIE III | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 6th day of April, 2018.

. . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, P.O. Box 20368, Dayton, Ohio 45420
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Thornton McKenzie III was convicted after a jury trial in the Montgomery County Court of Common Pleas of aggravated burglary, abduction, and misdemeanor assault. McKenzie appeals, claiming that his convictions were against the manifest weight of the evidence. For the following reasons, the trial court's judgment will be affirmed.

**Factual and Procedural History**

{¶ 2} At trial, the State presented the testimony of Misty Parlett, Sheila Holland (Parlett's mother), Parlett's 19-year-old son, Kaden Baker, and responding law enforcement officers. McKenzie did not testify or present any witnesses. The evidence at trial established the following facts.

{¶ 3} McKenzie and Parlett were in a relationship for approximately eight months, but had broken up in the fall of 2016. In January 2017, they were considering getting back together. On January 11, 2017, Parlett stayed overnight with McKenzie at a residence on Pomeroy Avenue in Trotwood. According to Parlett, in the early morning hours of January 12, McKenzie started to get "real mean." Parlett testified that McKenzie told her, "I'll kill you b[****], if you leave," among other things. McKenzie also started hitting Parlett and "smacking [her] across [her] legs."

{¶ 4} During the afternoon of January 12, Parlett's brother, Larry, came to the residence. At some point, Parlett told her brother, behind McKenzie's back, that she wanted to leave. She whispered to him, "You got to get me out of here." Parlett testified that McKenzie had her "locked up" and that she could not leave. Larry Parlett suggested that they take a walk, and he (Larry), Parlett, and McKenzie left the residence and walked

to the home of a friend of Parlett, who lived on nearby Hanna Avenue.

{¶ 5} With her brother and McKenzie waiting outside, Parlett told her friend, "You got to let me in, because he's really going to hurt me." The friend let Parlett in, and Parlett used her friend's cell phone to call the police. Parlett told the dispatcher that "there's a guy wanting to kill me," and she identified the man as McKenzie. When asked why she believed McKenzie wanted to kill her, Parlett told the dispatcher that McKenzie had "already been hitting on me tonight." While Parlett was on the phone with the dispatcher, McKenzie became aware that Parlett was on the phone. Parlett testified that McKenzie hit her on the head, causing her to see stars; Parlett also relayed to the dispatcher that McKenzie had hit her on the head. McKenzie left before the police arrived. Larry Parlett also left, indicating that he was going to his mother's (Holland's) home, which was on Pomeroy Avenue, a block from the residence where McKenzie was staying.

{¶ 6} Trotwood Police Officer Bethany Morrissette responded to Parlett's 911 call. The officer testified that Parlett was upset and crying, and Morrissette observed a bump on Parlett's head. Officer Morrissette and other officers in the area drove around attempting to locate McKenzie, but they were unsuccessful.

{¶ 7} After speaking with the police, Parlett walked to her mother's (Holland's) home and sat with her brother, Larry, in the living room; her son, who lived with Holland, was in his bedroom. Soon afterward, Larry's friend, Aaron Saunders, came to Holland's house. Larry Parlett let Saunders in, then Saunders walked out and came back in again. Sensing something was wrong, Parlett told her brother to lock the screen door behind Saunders. Larry did.

{¶ 8} A few moments later, at approximately 9:30 p.m., McKenzie broke through the screen door, came over to the couch, and started hitting Parlett all over her body. Hearing the commotion, Baker came out of his bedroom and saw his mother (Parlett) on the floor with McKenzie on her. McKenzie dragged Parlett by her body and hair out of the house and onto the front porch, threw her off the front porch, and then dragged her up Pomeroy Avenue, between houses and toward an alley. Larry Parlett yelled to Baker to call 911. Baker called the police and relayed what he had seen to the dispatcher. After a few minutes, Larry took the phone and talked to the dispatcher.

{¶ 9} Parlett testified that she was screaming as McKenzie dragged her up an alley and that McKenzie put his hand over her mouth to keep her quiet. McKenzie told her to be quiet, that he loved her, and that he did not want to go to jail. At some point, McKenzie loosened his grip, and Parlett "slid out from underneath him" and ran toward the sound of approaching police cruisers.

{¶ 10} Several officers responded to the dispatch regarding the events at Holland's residence. Deputy Walter Bender observed McKenzie running in the alley between Hanna and Pomeroy Avenues, and then into a wooded area. Deputy Bender and another deputy set up a perimeter, and Bender called for a K-9 unit. Deputy John Campbell and his canine, Daphne, responded, and Daphne successfully tracked McKenzie's scent. McKenzie was found lying face-down beside a "shed barn" in a vacant lot on Hanna Avenue. McKenzie was placed in the rear of Officer Matthew Hogan's cruiser.

{¶ 11} Deputy Brian Krimmer, who was driving in a separate cruiser behind Deputy Bender, turned onto a cross-street after Deputy Bender spotted McKenzie. However,

about ten feet down the road, he observed Parlett lying in the street. Krimmer placed Parlett, who was "hysterical" and crying, into his cruiser. Krimmer noticed blood on Parlett's face, and he called for an ambulance. Officer Morrissette made contact with Parlett in the ambulance. Morrissette, who had responded to Parlett's prior 911 call, noticed that Parlett now had several additional injuries, including several scrapes on her legs and arms and fresh blood on her face.

{¶ 12} Holland testified that, at approximately 9:30 or 10:00 p.m. on January 12, 2017, she received a telephone call from her grandson, Baker, while she was at work. She testified that Baker sounded nervous and shaky. He told Holland that she needed to come home, because McKenzie and Parlett were fighting and the house was being destroyed. Holland stated that only her grandson and sometimes his mother (Parlett) were allowed in her home when she was at work; she expressly stated that McKenzie was not allowed in her home when she was at work.

{¶ 13} Holland immediately left work and returned to her home on Pomeroy Avenue. She found that her screen door was broken, her house "was destroyed," her plants had been knocked over, and her couch had been moved. The police had already responded, and McKenzie was seated in a police cruiser in front of Holland's residence. Holland heard McKenzie yelling that he loved Parlett and "You're my wife, we're married," although McKenzie and Parlett were not married. Holland indicated that Parlett, Larry Parlett, and Baker were at her residence; Parlett was being treated in an ambulance when Holland arrived home. Holland saw Parlett approximately 30-45 minutes later, when Parlett exited the ambulance; Holland observed "a few little red marks" on the side of Parlett's neck and that Parlett's hair "was messed up."

{¶ 14} Parlett testified that, after McKenzie's arrest, she received telephone calls and correspondence from McKenzie. In three letters to Parlett (State's Exhibits 1B, 1C, and 1D), McKenzie apologized to Parlett and her family and expressed his love for her. In another letter (State's Exhibit 2B), McKenzie asked Parlett to "put [this] behind us." The police also obtained correspondence from McKenzie to "Jimmy O'Brien," asking Jimmy to call his (McKenzie's) lawyer and to recant his (Jimmy's) statement to the police.[1] During two different telephone calls between Parlett and McKenzie while McKenzie was in jail, Parlett told McKenzie that he did not have a right to assault her at Holland's house; McKenzie repeatedly responded that he had already apologized and that he was high at the time.

{¶ 15} The jury found McKenzie guilty of aggravated burglary, abduction, and assault at Holland's house. It acquitted McKenzie of a second count of assault based on McKenzie's alleged actions at Parlett's friend's house on Hanna Avenue. The trial court sentenced McKenzie to concurrent sentences of 36 months for abduction, 180 days for assault, and a mandatory nine years in prison for aggravated burglary. McKenzie was also ordered to pay restitution of $150 to Holland.

### Manifest Weight of the Evidence

{¶ 16} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-

---

[1] It is unclear what connection Jimmy O'Brien has to this case. Parlett testified that she did not know anyone named Jimmy O'Brien and that no one named Jimmy O'Brien was present during the relevant events. Holland testified that Saunders gave two letters (State's Exhibits 2A and 2B) to her and that she (Holland) gave those letters to Parlett. Parlett testified that she gave them to the police.

525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 17} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 18} McKenzie claims that his convictions were against the manifest weight of the evidence, because portions of Parlett's testimony were "incredible." Specifically, McKenzie argues that there were discrepancies between Parlett's testimony and Baker's testimony, Parlett's testimony was self-serving, and some of Parlett's testimony was impeached by her prior written statement and statements on the jail and 911 calls.

{¶ 19} Upon review of the evidence presented at trial, we conclude that the jury

did not lose its way when it convicted McKenzie of aggravated burglary, abduction, and assault, all of which occurred at Holland's residence. Parlett testified that, on January 12, 2017, she and her brother were at their mother's residence when Larry's friend, Saunders, came to the residence. At her request, Larry locked the screen door after Saunders entered. Parlett testified that McKenzie broke into the house and proceeded to assault her and drag her out of the house against her will.

{¶ 20} Parlett's testimony was corroborated by several witnesses. Holland observed that her screen door was broken and that her home was in disarray upon returning home from work after receiving a phone call from her grandson, Baker. Baker testified that he observed McKenzie assaulting his mother when he came out of his bedroom; Baker indicated that McKenzie grabbed Parlett by her hair, pulled her out of the house, and threw her off the porch. Baker's statement to the dispatcher was generally consistent with his testimony. Larry Parlett, who did not testify[2] but spoke with the dispatcher, told the dispatcher that he had locked the screen door, but McKenzie "jerked the door open" and started assaulting his sister. Responding officers observed scrapes and blood on Parlett; Officer Morrissette, who had responded to Parlett's prior 911 call, observed additional injuries after responding to Baker's 911 call. Finally, in telephone calls from the jail, McKenzie acknowledged to Parlett that he had assaulted her at Holland's residence.

{¶ 21} It was the province of the jury to determine what evidence to credit. Considering all of the evidence at trial, we cannot conclude that the jury lost its way in determining that McKenzie committed aggravated burglary and both assaulted and

---

[2] Larry Parlett died prior to the trial.

abducted Parlett at Holland's residence on January 12, 2017.   McKenzie's assignment of error is overruled.

## Conclusion

**{¶ 22}** The trial court's judgment will be affirmed.

. . . . . . . . . . . . .


DONOVAN, J. and TUCKER, J., concur.


Copies mailed to:

Mathias H. Heck
Sarah E. Hutnik
James S. Armstrong
Hon. Steven K. Dankof